IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                                    )
IN RE LITERARY WORKS IN ELECTRONIC      )         MDL No. 1379
DATABASES COPYRIGHT LITIGATION          )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR FINAL APPROVAL
OF REVISED SETTLEMENT**

Michael J. Boni
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004

A. J. De Bartolomeo
Girard Gibbs LLP
601 California St., 14th Floor
San Francisco, CA 94108

Diane S. Rice
Hosie Rice LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111

Gary Fergus
Fergus, A Law Office
595 Market Street, Suite 2430
San Francisco, CA 94105

Category A/B Counsel

Charles Chalmers
Allegiance Litigation
769 Center Boulevard, Suite 134
Fairfax, CA 94930

Category C Counsel

Dated:  June 3, 2014

# **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................. 1

     A.    Class Benefits And Releases Under The Revised Settlement ................................ 1

          1.    The Defense Group ............................................................................ 1

          2.    The Settlement Class............................................................................ 2

          3.    Settlement Payments ......................................................................... 3

          4.    Attorneys' Fees, Reimbursement Of Expenses, And Awards To
              Representative Plaintiffs; Notice and Administration Costs ..................... 6

          5.    Releases................................................................................................ 6

     B.    Notice Has Been Given In Accordance With The Court's Order........................... 7

     C.    Exclusions And Objections................................................................................. 7

III.  LEGAL STANDARDS ..................................................................................... 7

IV.   THE SETTLEMENT PROCESS WAS PROCEDURALLY FAIR................................. 8

     A.    The Settlement Is A Product Of Arm's-Length Negotiations. .............................. 8

V.    THE SETTLEMENT IS SUBSTANTIVELY FAIR.......................................................... 9

     A.    The *Grinnell* Factors ........................................................................................ 9

     B.    The Complexity, Expense And Likely Duration Of The Litigation ..................... 10

     C.    The Reaction Of The Class To The Settlement ................................................... 12

     D.    The Stage Of The Proceedings And The Amount Of Discovery Completed ....... 13

     E.    The Risks Of Establishing Liability................................................................... 14

     F.    The Risks Of Establishing Damages.................................................................. 14

     G.    The Risks Of Maintaining The Class Action Through Trial ............................... 15

     H.    The Ability Of The Defendants To Withstand A Greater Judgment .................... 16

i

I.      The Range Of Reasonableness Of The Settlement Fund In Light Of The Best Possible Recovery And Attendant Risks Of Litigation ........................................ 16

VI.    OBJECTIONS AND OTHER COMMENTS FROM THE CLASS ............................... 17

A.     There Is No Merit To The Objections And Comments Concerning Lack Of Previous Notice Or A Second Claim Opportunity................................................. 18

1.     Notice/Claim Opportunity Issues Raised By Class Members Fox, Horschak, McDougal, Petkanas, And Thornton ....................................... 18

2.     Other Issues Raised By Thornton, Horschak, And Fox Incorrect addresses (Thornton and Horschak). ........................................ 22

B.     The Comments Of Class Members Janice DeKnock And Barbara Kevles Are Either Mistaken Or Meritless.................................................................................... 23

VII.   CERTIFICATION OF THE CLASS AND SUBCLASSES SHOULD BE MADE FINAL FOR SETTLEMENT PURPOSES. .................................................................... 24

VIII.  CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor*
    521 U.S. 591 (1997).......................................................................................... 25

*Beckman v. KeyBank, N.A.*
    293 F.R.D. 467 (S.D.N.Y. 2013) ..................................................................... 16

*Charron v. Pinnacle Group N.Y. LLC*
    874 F. Supp. 2d 179 (S.D.N.Y. 2012)............................................................. 12

*Charron v. Wiener*
    731 F.3d 241 (2d Cir. 2013)............................................................................... 8

*City of Detroit v. Grinnell Corp.*
    495 F.2d 448 (2d Cir.1974)................................................................... 8, 10, 21

*D'Amato v. Deutsche Bank*
    236 F.3d 78 (2d Cir. 2001)................................................................ 10, 12, 16

*Davis v. The Gap, Inc.*
    246 F.3d 152 (2d Cir. 2001).............................................................................. 15

*In re Independent Energy Holdings PLC Sec. Litig.*
    302 F. Supp. 2d 180 (S.D.N.Y. 2003)............................................................. 22

*In re Literary Works in Elec. Databases Copyright Litigation*
    7(2d Cir. 2011).................................................................................... 3, 23, 24

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*
    164 F.R.D. 362 (S.D.N.Y. 1996) .................................................................... 20

*Maley v. Del Global Technologies Corp.*
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)....................................................... 11, 13, 17

*Mullane v. Central Hanover Bank Trust Co.*
    339 U.S. 306 (1950)...................................................................................... 21, 23

*New York Times Company, Inc. v. Tasini*
    533 U.S. 483 (2001)........................................................................................ 3, 10

*Reed Elsevier v. Muchnick*
    559 U.S. 154 (2010).......................................................................................... 14

*Shapiro v. JPMorgan Chase & Co.*
   2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ............................................................ 10, 15, 22

*Thompson v. Metropolitan Life Ins. Co.*
   216 F.R.D. 55 (S.D.N.Y. 2003) .................................................................................... 10

*Wal-Mart Stores, Inc. v. Visa U.S.A Inc.*
   396 F.3d 96 (2d Cir. 2005).................................................................................... passim

*Weigner v. City of New York*
   852 F.2d 646 (2d Cir. 1988)........................................................................................ 22

**Rules**

Fed. R. Civ. P. 23......................................................................................................... passim

**Statutes**

17 U.S.C. § 411(a) ........................................................................................................ 14

## I.    <u>INTRODUCTION</u>

Under Rule 23(e) of the Federal Rules of Civil Procedure, plaintiffs respectfully seek final approval of the revised class action settlement in this case.  The original settlement was approved in September 2005, but vacated by the Second Circuit in August 2011.  The revised settlement is based on the original, but has revisions and was reached after a negotiation process that resolved the Second Circuit's concerns.  The attorney for the objector-appellants negotiated exclusively for Category C claimants and obtained more compensation for them.  In addition, the "C reduction" provision, under which Category C payments would be reduced if the original $18 million payout ceiling was exceeded, was eliminated, as was the $18 million cap itself.

The Court granted preliminary approval of the settlement on January 22, 2014, and notice was given to the class.  Just 62 members of the class have opted out of the revised settlement, and just one class member has filed an objection to it, an objection that is meritless.  The settlement was negotiated at arm's length by experienced, capable counsel, and its terms are substantively fair.  The Court should approve the settlement as fair, reasonable, and adequate.

## II.    <u>STATEMENT OF FACTS</u>

### A.    <u>Class Benefits And Releases Under The Revised Settlement</u>

#### 1.    The Defense Group

Benefits under the proposed settlement will be provided by defendants and certain non-party print publishers.  Defendants are (1) fourteen current and former commercial electronic database operators ("Database Defendants"); and (2) two newspaper publishers, The New York Times Company and The Copley Press, Inc.

Also, many newspaper and magazine publishers have agreed to participate in the settlement by contributing essential funding, as well as information concerning their freelance

authors' works ("Participating Publishers").  A list of the Participating Publishers is attached to the Revised Settlement Agreement as Exhibit A.  The Participating Publishers and Defendants are referred to collectively as the "Defense Group."

In addition, other publishers that supplied works to the Database Defendants and elect to pay claims under the Plan of Allocation (described in part II.C below) for Subject Works they first published will be released from claims pertaining to those Subject Works.  Those publishers are referred to as "Supplemental Participating Publishers."

### 2.  The Settlement Class

The class proposed for purposes of the revised settlement remains the same as the one in the original settlement:  all persons who own a copyright under the United States copyright laws in an English language literary work that, at any time after August 14, 1997 and before May 31, 2005, was reproduced, displayed, sold and/or distributed in an electronic format (*i.e.*, online, on CD-ROM, or in any other electronic format) by any Defense Group member, without the person's authorization.  These works are referred to as the "Subject Works."

A person is a class member even if (a) his or her Subject Work was not registered with the U.S. Copyright Office; (b) his or her Subject Work was originally published outside the U.S., so long as the work was published in English and in a country that is a member of the Berne Convention; (c) the person signed a license agreement granting a publisher "retroactive electronic rights" to a Subject Work that had been previously electronically published without the person's permission;[1] or (d) the person authorized the New York Times Company to

---

[1] The Subject Work is not covered, however, if the license agreement contained express language waiving or releasing all copyright infringement claims pertaining to previously written Subject Works, and the person did not register the previously written Subject Works with the U.S. Copyright Office.

electronically publish his or her Subject Works pursuant to the company's "Restoration Request Website" or print advertisements shortly after June 25, 2001, when the Supreme Court ruled against the company in *New York Times Company, Inc. v. Tasini*, 533 U.S. 483 (2001).

The class is divided into two subclasses in accordance with the Second Circuit's August 2011 opinion. The Category A/B Subclass consists of all class members to the extent they own copyrights in Subject Works that fall into Category A or B, as described below. The Category C Subclass consists of all class members to the extent they own copyrights in Category C Subject Works. Some class members belong to both subclasses because they have both registered and unregistered Subject Works.[2]

### 3.    Settlement Payments

Under the revised settlement, class members who submitted valid Proofs of Claim by the deadline for the original settlement—September 30, 2005—will be issued payments calculated according to the Plan of Allocation below.[3] Class members cannot submit new claims or revise previously submitted ones, but they were given a second chance to opt out or object. (The deadline to do so was May 9, 2014.) Instead of committing to pay claims up to a certain ceiling, as under the original settlement, defendants have agreed to pay all timely, valid claims.

**Category A Subject Works.** For each Subject Work the class member registered with

---

[2] The Second Circuit had suggested that having separate representation for each category of work in settlement negotiations would be efficient and straightforward, but recognized that some other solution might be more appropriate in the end. *See In re Literary Works in Elec. Databases Copyright Litigation*, 654 F.3d 242, 257 (2d Cir. 2011). There was no conflict between the Category A and B works, however, as they would have been treated the same way if the original $18 million payout cap had been exceeded. Not even the objectors on appeal argued there was a conflict between the A and B works. Therefore, there was no need for the A and B works to be separately represented in the revised-settlement negotiations.

[3] Late claims were and are considered timely if the submitting class members cited Hurricane Katrina as the reason for filing after the deadline.

the U.S. Copyright Office (a) before any infringement after the Subject Work was first published, or (b) within three months after first publication of the work, the person will receive:

- $1,500 for each of the first fifteen Subject Works written for any one publisher;

- $1,200 for each of the second fifteen Subject Works written for that publisher; and

- $875 for each Subject Work written for that publisher after the first thirty.

**Category B Subject Works.**  If the class member registered the Subject Work before December 31, 2002, but after any infringement of the work and more than three months after the first publication of the Subject Work, the person will receive, per each such Subject Work, the greater of $150 or 12.5% of the original sale price of the Subject Work.  Any claim that would otherwise be a valid Category B claim will be reclassified and paid as a Category A claim if the claimant registered copyright in the Subject Work prior to the licensing and delivery of that work to Amazon.com or Highbeam (a/k/a Highbeam Research) by any defendant.

**Category C Subject Works.**  For all other Subject Works (including Subject Works that were never registered), the class member will receive, per Subject Work:

- $68.40 for each Subject Work originally sold for $3,000 or more;

- $57.00 for each Subject Work originally sold for $2,000 to $2,999;

- $45.60 for each Subject Work originally sold for $1,000 to $1,999;

- $28.50 for each Subject Work originally sold for $250 to $999;

- The greater of $5.70 or 11.4% of the original price of the Subject Work for works that originally sold for $249 or less.

Furthermore, each valid Category C claimant will be allocated a pro rata share of an additional $343,500 in cash being contributed by the Database Defendants under the revised settlement.  In addition, still more money may be available for Category C claimants depending

on the amount of settlement administration costs.  In 2005, the Database Defendants deposited $5 million toward their payment obligations under the original settlement.  $517,000 of earnings and interest on that deposit, which accrued during the pendency of the appeal (called the "Initial Interest" in the Revised Settlement Agreement), has been earmarked by agreement for use, to the extent necessary, in the payment of certain administrative expenses.  If there is a balance remaining after payment of the listed items, additional money, possibly as much as $200,000 or more, will be allocated pro rata among all Category C claimants.

**Reduced payments for older Subject Works.**  For Subject Works created before January 1, 1995, payments in **Categories B and C** above will be reduced based on the years in which the Subject Work was created, as follows:

- <u>Subject Works created in 1985-1994</u>:  Payments reduced by 5% for each year beginning in 1994 and continuing through 1985, so that payments for Subject Works created in 1994 will be reduced by 5%; payments for Subject Works created in 1993 will be reduced by 10%, and so on until works created in 1985 (payments reduced by 50%).

- <u>Subject Works created in or before 1985</u>:  Payments reduced by 50%.  Under no circumstances, however, will any reduction for older works reduce a settlement payment to less than $5.70.

**Rights with respect to future electronic use.**  Settlement payments represent compensation both for past infringement and for the right to future electronic use of the Subject Works by the Defense Group and/or Supplemental Participating Publishers.  Plaintiffs consider 65% of each settlement payment as compensation for past infringement, and 35% as compensation for future electronic rights.  If class members chose not to grant future electronic rights in submitting their claims, they will receive 65% of the total settlement payment.  The Defense Group and Supplemental Participating Publishers are responsible for removing from

their databases all Subject Works as to which class members chose not to grant future rights.[4] Defendants and publishers retain the right to license and sublicense works that were not "taken down" by class members under the settlement.

**Syndicated works.**  The revised settlement agreement also clarifies that the settlement payment for those syndicated works that are considered a single Subject Work will be based on the payment made by the publication that first published the work—not on the aggregate amount paid for the syndicated work by all publishers.  The original settlement agreement was silent on how to calculate the settlement payment in these circumstances.

### 4. Attorneys' Fees, Reimbursement Of Expenses, And Awards To Representative Plaintiffs; Notice and Administration Costs

Any attorney fee and expense awards and incentive awards to representative plaintiffs will be paid separately from, and will not reduce, the settlement payments to valid claimants. Notice and settlement administration costs will be paid as described in Exhibit C to the Revised Settlement Agreement.

### 5. Releases

Under the revised settlement, the Defense Group and Supplemental Participating Publishers, and their respective affiliates, predecessors, successors, directors, officers, employees, agents, representatives and assigns, will be released from claims that were or could have been asserted in this litigation based on the Subject Works, including but not limited to all copyright infringement claims and claims based on the electronic reproduction, distribution,

---

[4] If a class member already signed a written agreement with a print publication granting electronic rights to the person's unregistered Subject Works (falling into Category C described above), the class member has already granted a license for future use of those works.  Such class members no longer have the option of withholding electronic rights, and are eligible to receive just 65% of the total settlement payment.

display, sale, or adaptation of the Subject Works to or by a member of the Defense Group or a Supplemental Participating Publisher.

### B.   Notice Has Been Given In Accordance With The Court's Order.

In granting preliminary approval of the revised settlement, the Court ordered that notice be given to the class in various forms and through various methods.   (*See* Order Granting Preliminary Approval Of Revised Proposed Class Action Settlement filed Jan. 22, 2014, ¶¶ 11-13.)   Notice was disseminated as ordered by the Court.   (*See* accompanying Declaration Of Jose C. Fraga Regarding (A) Mailing Of The Notice; (B) Implementation Of Telephone Hotline And Official Settlement Website; And (C) Requests For Exclusion; Declaration Of Lael D. Dowd Concerning Implementation Of Class Notification Program.)

### C.   Exclusions And Objections

517 people opted out of the class—62 in response to the revised settlement, and 455 in response to the original (and 313 of those were Canadians, who presumably opted out so as to remain class members in similar litigation that was pending in Canada).   Just one class member filed an objection, and seven others raised issues with class counsel concerning the settlement.[5]

### III.   LEGAL STANDARDS

Class claims may not be settled without court approval.  Fed. R. Civ. P. 23(e).  A district court may approve a class settlement "only after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(1).  There is a "strong judicial policy in favor

---

[5] One of the original class attorneys in this case, Emily Bass, somehow enlisted a group of class members to file an "objection" arguing that she is entitled to a greater allocation of A/B Counsel's requested fee award.  Only one of the group submitted a claim for a Category A or B work, and seven did not submit any claim at all.  That "objection" has nothing to do with the fairness of the settlement for the class, and A/B Counsel respond to it in a separate memorandum filed herewith.

of settlements, particularly in the class action context." *Wal-Mart Stores, Inc. v. Visa U.S.A Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (internal quotation marks omitted). The settlement approval decision is committed to the court's broad discretion, and the court's views are entitled to "great weight" because of its proximity to the parties, their positions, and the evidence. *Charron v. Wiener,* 731 F.3d 241, 247 (2d Cir. 2013).

A class settlement must be evaluated for both procedural and substantive fairness. In assessing procedural fairness, the court must decide whether "the settlement resulted from an arm's-length, good faith negotiation between experienced and skilled litigators." *Charron*, 731 F.3d at 247. In assessing substantive fairness, the court must consider the so-called "*Grinnell* factors," i.e., the criteria listed in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974). *Charron*, 731 F.3d at 247.

## IV.     THE SETTLEMENT PROCESS WAS PROCEDURALLY FAIR.

### A.     The Settlement Is A Product Of Arm's-Length Negotiations.

"A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart*, 396 F.3d at 116 (internal quotation marks omitted).

Here, the original settlement was negotiated over a period exceeding three years. Class counsel have substantial experience in prosecuting and resolving class actions and other complex litigation. Defense counsel are among the nation's leading intellectual-property attorneys. The negotiations took place at arm's length, were adversarial, and were facilitated by nationally prominent mediator Kenneth Feinberg. The material settlement terms were not reached before plaintiffs' counsel thoroughly investigated and researched the relevant facts and law, including reviewing substantial amounts of discovery produced by defendants and the Associational

Plaintiffs.  Plaintiffs also retained an economist expert who prepared a damages report for plaintiffs, and a copyright expert, who consulted with plaintiffs on relevant copyright issues.

After the Second Circuit vacated the settlement approval, and the case was remanded to this Court, the parties and the objectors embarked on approximately 20 months of negotiations in an attempt to reach a revised settlement.  As with the negotiations for the original settlement, the three-way bargaining was at arm's length and hard-fought.  The objectors argued vociferously on behalf of the Category C claims; plaintiffs held the line on the position of the Category As and Bs; and defendants ultimately agreed to pay more money to resolve the case.

In short, the revised settlement is the product of many years of factual and legal investigation, mediation, mediation-related discovery, and adversarial bargaining conducted by experienced, capable counsel.  Thus, the settlement process was procedurally fair, giving rise to a presumption that the settlement is substantively fair.

## V.     THE SETTLEMENT IS SUBSTANTIVELY FAIR.

### A.     The *Grinnell* Factors

In deciding the substantive fairness of a class action settlement, i.e., whether it is fair, reasonable, and adequate, courts in the Second Circuit are to consider the following factors listed in the *Grinnell* decision:

> (1) the complexity, expense and likely duration of the litigation;
>
> (2) the reaction of the class to the settlement;
>
> (3) the stage of the proceedings and the amount of discovery completed;
>
> (4) the risks of establishing liability;
>
> (5) the risks of establishing damages;
>
> (6) the risks of maintaining the class action through the trial;

      (7) the ability of the defendants to withstand a greater judgment;

      (8) the range of reasonableness of the settlement fund in light of the best possible recovery;

      (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Wal-Mart*, 396 F.3d at 117 (citing *Grinnell*, 495 F.2d at 463).  "All nine factors need not be satisfied, rather, the court should consider the totality of these factors in light of the particular circumstances."  *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003) (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001)).

      "In assessing a settlement, the Court should neither substitute its judgment for that of the parties who negotiated the settlement, nor conduct a mini-trial on the merits of the action."  *Shapiro v. JPMorgan Chase & Co.*, Case No. 11 Civ. 8331 (CM) (MHD), 2014 WL 1224666, at *7 (S.D.N.Y. Mar. 24, 2014).  "Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that, while a court should not give 'rubber stamp approval' to a settlement, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case."  *Id.*

      Application of these principles and the *Grinnell* factors here confirms that the settlement is fair, reasonable, and adequate.

**B.**      <u>The Complexity, Expense And Likely Duration Of The Litigation</u>

      Although the decision in *Tasini*, 533 U.S. 483, resolved a liability issue in favor of plaintiffs—i.e., that non-image-based electronic reproduction of freelance works is not a "revision" of a collective work under section 201(c) of the Copyright Act—the case left unresolved many other complex issues in this case.  *See Wal-Mart*, 396 F.3d at 118-19 (although government's successful prosecution of key liability issue "improved plaintiffs' likelihood of

success," court nevertheless found case complex).

Here, defendants' many arguments included these:  if a class could be certified at all, it had to be limited to authors who registered their works with the U.S. Copyright Office; no class could be certified anyway because individual issues predominated; identification of the infringed works was unmanageable on a class basis; and plaintiffs' damages analysis was flawed because the value of printed freelance work was very low, the electronic market for resale of freelance works was small, and defendants' profits have been minimal.  Even if the case made it to trial, plaintiffs would have to spend much effort and bear significant risk at trial, in post-trial motions, and on appeal (and possibly before the Supreme Court again) to obtain a judgment for the class.

Furthermore, the very history of this case is ample evidence of its complexity, expense, and protracted nature.  The case was filed in 2000, fourteen years ago.  It has been before the Second Circuit (twice) and the Supreme Court.  It has involved two long, arduous periods of settlement negotiations and a stream of complex appellate issues.  It has cost class counsel over $600,000 in out-of-pocket costs alone, and defendants have undoubtedly spent millions in legal fees and expenses.  If the revised settlement is not approved, the case would likely take several more years to reach a conclusion.

The complexity, expense, and likely duration of continued litigation thus weigh in favor of settlement approval, *especially considering that class members who filed valid claims under the original settlement have been waiting almost a decade for their compensation*.  *See Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial.  These factors weigh in favor of the proposed Settlement.").

11

### C.    The Reaction Of The Class To The Settlement

The reaction of the class strongly supports the settlement.  Almost 78,000 individual notices were mailed or emailed to potential class members, and the publication component of the notice program was designed to reach many more.  Only one class member filed an objection, and a handful of others have raised issues about the settlement with class counsel.  Thus, even if the number of class members were limited to those who were sent individual notice, only 0.01 percent responded with some sort of concern, strongly militating in favor of settlement approval.  *See Wal-Mart*, 396 F.3d at 118 ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.") (internal quotation marks omitted); *D'Amato*, 236 F.3d at 86 (where only 18 objections were received after 27,883 notices had been sent, or approximately 0.06%, Second Circuit held that "[t]he District Court properly concluded that this small number of objections weighed in favor of the settlement").

Similarly, only 517 people have opted out—62 in response to the revised settlement and 455 in response to the original.  Furthermore, 313 of the original 455 opt-outs were Canadians (*see* Dkt. No. 134, Declaration Of Patrick M. Passarella In Support Of Plaintiffs' Motion For Final Settlement Approval, filed Sept. 19, 2005, ¶ 18), who presumably opted out so as to remain class members in similar litigation then pending in Canada.  (In fact, the Canadian plaintiffs and their counsel instituted a public drive to encourage opt-outs from this U.S. action.)  If the number of class members is limited to those who were sent individual notice, less than 0.7 percent have excluded themselves.  If the Canadian opt-outs are disregarded, then 0.33 percent have done so. *See Charron v. Pinnacle Group N.Y. LLC*, 874 F. Supp. 2d 179, 197 (S.D.N.Y. 2012) ("That the overwhelming majority of class members have elected to remain in the Settlement Class, without objection, constitutes the 'reaction of the class,' as a whole," and supports a finding that "the

Settlement is 'fair, reasonable, and adequate.'") (internal quotation marks omitted).

As further evidence of support for the settlement, class members have filed claims that, if valid, will result in payments totaling approximately $12 million.  Moreover, at the time of the original settlement, a number of class members wrote in to express their support and describe the real difference the compensation would make in their lives.  That claimants are still waiting for the money they expected to receive in 2005 provides yet more impetus to approve the settlement.

### D.      The Stage Of The Proceedings And The Amount Of Discovery Completed

The mediated settlement negotiations that resulted in the original settlement lasted over three years, and virtually every relevant factual and legal issue was vigorously contested before the mediators.  The parties also exchanged a substantial amount of information relating to potential damages.  Among other things, the Database Defendants produced information concerning royalty payments made to content providers, revenues received from subscribers and/or users, licensing terms, and articles that had been removed recently from databases.  The content providers also provided information, including license fees, the number of articles per year, the percentage of articles that were freelance articles in each publication's database, and the expense and revenue for publication archives.  A/B Counsel ultimately concluded that defendants had supplied enough information to enable a realistic evaluation of the class claims.

Thus, counsel's decisions to enter into both the original and revised settlements have been made on a sufficiently informed basis.  *See Maley*, 186 F. Supp. 2d at 363 ("To approve a settlement, . . . the Court need not find that the parties have engaged in extensive discovery," so long as "Plaintiffs' Counsel possessed a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of settlement.") (internal quotation marks omitted).

### E.    The Risks Of Establishing Liability

However confident plaintiffs may be in the strength of their case, there is still substantial risk that they could not establish liability on their claims in continued litigation.

Most of the works at issue here were never registered with the U.S. Copyright Office. 17 U.S.C. § 411(a) says that generally, a copyright infringement action may not be brought unless preregistration or registration of the copyright has been made.  The Supreme Court held that this Court had jurisdiction to approve a settlement resolving claims based on unregistered works, but that the section 411(a) registration requirement remains "a precondition to filing a claim." *Reed Elsevier v. Muchnick*, 559 U.S. 154 (2010).  Thus, if litigation of this matter were to resume, plaintiffs would still face the risk they could not maintain unregistered-work claims.

Furthermore, as to all the works, whether unregistered or registered, defendants argued that other defenses against liability existed, including the existence of oral and implied-in-fact licenses, and bars based on estoppel, acquiescence, and laches.

### F.    The Risks Of Establishing Damages

The issue of damages also remained an area of substantial risk.  For instance, if plaintiffs received a ruling that they could not proceed with claims based on unregistered works (the great majority of the works in suit), they necessarily could not establish corresponding damages.

As part of the mediated negotiations preceding the original settlement, A/B Counsel retained Dr. Jeffrey J. Leitzinger, a leading economics expert, to analyze the damages in this case.  Dr. Leitzinger calculated damages using three alternative approaches, arriving at an estimate of $35-71 million for all defendants.  Defendants heavily criticized the analysis and argued that damages were much lower.

Among other things, to prove damages, plaintiffs would need to account for the fact that

the Database Defendants licensed entire libraries of works, not individual articles, and determine which revenues were specifically attributable to the infringement of the freelance contributions. *See Davis v. The Gap, Inc.,* 246 F.3d 152, 160 (2d Cir. 2001) ("[I]f a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think that plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue from its publication of hundreds of titles, including trade books, textbooks, cookbooks, etc. ***In our view, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem***.") (emphasis added).  Furthermore, to the extent there was any evidence of payment for the download of individual articles, the amounts involved tended be very small, e.g., a few dollars for a single download.

The risk of establishing damages further weighs in favor of settlement approval.  *See Shapiro*, 2014 WL 1224666, at *11 (approving settlement and citing risks of proving damages as factor) ("Proof of damages in complex class actions is always complex and difficult and often subject to expert testimony.").

### G.     The Risks Of Maintaining The Class Action Through Trial

The risk that a motion for class certification would be denied is another factor favoring settlement approval.  For instance, an inability to maintain claims based on unregistered works, as discussed above, would necessarily mean a class containing such works could not be certified.

Even if unregistered-work claims could proceed, or if plaintiffs sought certification of a class of registered works only, they would still face the arguments pressed by defendants in mediation that various individual issues would predominate over common ones.  Those issues include the measure of damages, which arguably would hinge on individual factors such as the original price paid for the work, the degree to which it was accessed or displayed by database

subscribers and customers and for how much, the level of notoriety of the author at the time of infringement, and how many times the work was otherwise infringed, e.g., how many databases included the work.  While plaintiffs believe that methods exist to calculate actual damages on a class-wide basis, there is a not insignificant risk that class certification could be denied on the ground that individual damages issues predominate.  Defendants would also offer evidence of the express and implied licenses by freelancers for electronic use of their works.  The determination of whether authors granted such licenses would also raise individual issues.

The risk of not being able to obtain or maintain class certification is yet another reason to approve the settlement.  *See Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 475-76 (S.D.N.Y. 2013) ("The risk of obtaining collective and class certification and maintaining both through trial is also present. . . . . The fifth *Grinnell* factor weighs in favor of final approval.").

### H.     The Ability Of The Defendants To Withstand A Greater Judgment

Even though defendants collectively can withstand a judgment greater than the amount payable in the settlement, this fact alone does not warrant disapproval of the settlement.  As the Second Circuit stated in *D'Amato*, 236 F.3d 78:

> The District Court explicitly acknowledged that the defendants' ability to withstand a higher judgment weighed against the settlement, but explained that this factor, standing alone, does not suggest that the settlement is unfair.  This conclusion cannot be considered an abuse of discretion, given that other *Grinnell* factors weigh heavily in favor of settlement.

*Id.* at 86 (citations omitted); *see also Beckman*, 293 F.R.D. at 476 ("Even if Defendant could have withstood a greater judgment, a 'defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair.'").

### I.     The Range Of Reasonableness Of The Settlement Fund In Light Of The Best Possible Recovery And Attendant Risks Of Litigation

As the Second Circuit stated in *Wal-Mart*, 396 F.3d 96:

16

> [T]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion—and the judge will not be reversed if the appellate court concludes that the settlement lies within that range.

*Id.* at 119 (internal quotation marks omitted).  A settlement falls within that range and warrants approval when "[t]he legal and factual difficulties inherent in th[e] case, . . . coupled with the unpredictability of a lengthy and complex trial, and the appellate process that would follow, with the risk of reversal, make the fairness of [a] substantial settlement readily apparent." *Maley*, 186 F. Supp. 2d at 366.

As described above, the revised settlement will provide substantial payments to valid claimants—in the total amount of approximately $12 million—in contrast to the significant risk and delay of continued litigation and a highly uncertain outcome for registered and unregistered works alike.  The risks of further litigation are particularly acute for authors of unregistered works.  A holding that an action cannot proceed without registration will result in a recovery of zero for those authors. In that scenario, the settlement provides Category C claimants with ***more*** than their best possible recovery in litigation.  The settlement thus lies within the range of reasonableness justifying final approval.

## VI.    OBJECTIONS AND OTHER COMMENTS FROM THE CLASS

Out of a class numbering in the tens of thousands, class counsel have seen objections or other comments concerning the settlement from only eight people.  Six of them raised an issue with notice and/or lack of a second claim opportunity under the revised settlement (and only one, Robert Thornton, appears to have filed his objection with the Court).  The other two questioned or commented about some other aspect of the settlement.  None of these objections or comments

presents a meritorious argument against settlement approval.[6]

**A.      There Is No Merit To The Objections And Comments Concerning Lack Of Previous Notice Or A Second Claim Opportunity.**

**1.      Notice/Claim Opportunity Issues Raised By Class Members Fox, Horschak, McDougal, Petkanas, And Thornton**

The six class members who raised an issue with notice and/or the absence of a second claim opportunity are James Fox, Andrew Horschak, Ellen Kozak, Dennis McDougal, Christopher Petkanas (none of whom filed an objection), and Robert Thornton (who did).  As Kozak's concerns have since been resolved through an individual settlement, this discussion will focus on the five others.[7]  Category C Counsel has already communicated with and responded to each of the five.  (*See* accompanying Declaration Of Charles Chalmers In Support Of Final Approval Of Revised Settlement ("Chalmers Decl.").)

**(i)      James Fox.**  James Fox, a resident of Canada, lodged a complaint through the settlement website stating that he never previously received notice about any settlement in this case, and that he and other writers in the same situation should now have a chance to file a claim. He had filed a claim in two similar class settlements in Canada, however.

**(ii)      Andrew Horschak.**  Andrew Horschak submitted a comment through the

---

[6] A ninth person, Justin Karl Swanson, sent the Court a letter dated March 11, 2014 complaining about what he perceives as persecution and exploitation by society and various government entities (e.g., "Spokane Washington the Down Town Area our Media and Down Town Partnership, are abusing both My City Civil, and Residents Rights to no end.").  As the letter does not discuss the settlement here, it is irrelevant and plaintiffs do not address it further.

[7] Kozak, a copyright attorney, contacted class counsel saying she had received notice of the revised settlement, but claiming she did not receive notice in 2005.  She asserted that the lack of a second claim opportunity was unfair and vowed to fight vigorously for it.  After further communications with Kozak by phone and email, class counsel discussed her situation with defense counsel.  She will be paid $1,750 for resolution of her potential copyright claims and her agreement not to object to the settlement or appeal from a decision approving the settlement.

18

settlement website stating that a notice was sent to a former address of his from 20 years ago with an incorrect name—"Norcia" instead of "Horschak."  (Presumably, the notice was then forwarded to him.)  Horschak stated that "[t]his is the first that I'm hearing of this."

(iii)    **Dennis McDougal.**  Dennis McDougal lodged a complaint through the settlement website stating he had never previously received notice of the settlement or claim deadline, and that he would be "outraged" if the settlement is approved without a second claim opportunity. According to the claims administrator's records, however, notice was mailed to him in 2005 at an address in Southern California twice—once as part of the initial wave of mailed notice, and again in response to a request he submitted through the settlement website.  (*See* accompanying Declaration Of Perry S. Carbone On Behalf Of The Garden City Group, Inc. Regarding Certain Class Members ¶ 2.)  In a subsequent discussion with C Counsel, McDougal acknowledged that he lived at that address during the first half of 2005, but because of certain developments he and his wife then moved out of California.  He assumes that any notice mailed to him around that time was lost in the move and/or not forwarded to his new address.

(iv)    **Christopher Petkanas.**  Unlike the others, Christopher Petkanas acknowledges he knew about the settlement in 2005 and asserts he submitted a claim at that time.  The claims administrator has no record of the claim, however (*id.* ¶ 3), and Petkanas cannot provide a copy of it or any other supporting documentation.  Defendants declined to let Petkanas refile his claim.

(v)    **Robert Thornton.**  Robert Thornton sent a letter to the Court, dated March 10, 2014, stating that a notice for the revised settlement had been sent to him at an incorrect address, and that conversely he had received notices addressed to six other people at his actual address. He enclosed copies of the seven notices, and asked the Court to direct class counsel to justify the lack of a second claim opportunity for people whose notices were sent to the wrong address.  On

April 8, 2014, A/B Counsel Mike Boni sent the Court a letter stating that counsel would investigate Thornton's situation and respond in their final-approval motion.

None of these five class members has presented an argument that warrants reopening the claims period. The positions of Petkanas and McDougal are most easily disposed of. Petkanas admits he had notice of the original settlement but cannot provide any proof that he submitted a claim in 2005. Under these circumstances, defendants are not obligated to let him file a claim now. McDougal admits that around the time the claims administrator mailed him notices of the original settlement—twice—he moved out of state, away from the address in the claims administrator's records. It is thus likely that McDougal's own actions caused the loss of the notices or prevented them from reaching him. *Cf. In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362, 369 (S.D.N.Y. 1996) ("[N]otice by mail sent to the last known address of the absent class member meets the due process requirement of notice through 'reasonable effort' even where numerous class members have since changed addresses and do not receive notice.").

Furthermore, even if notice had never been mailed to McDougal in the first place, a second claim opportunity is still not required for him or the other class members (Fox, Horschak, and Thornton) who assert they did not receive actual notice of the 2005 claim deadline. The revised settlement is just that—a revision or continuation of the original one, as opposed to a new settlement altogether. The Category A/B compensation schedule remains unchanged, for instance, and claims processing simply picks up where it left off when the appeal was filed. In the revised-settlement negotiations, defendants agreed to pay more compensation to Category C claimants and eliminate the total-payout cap as sought by Category C Counsel, but would not agree to the open-ended financial liability associated with a second claim opportunity. The notice campaign for the original settlement had elicited claims from numerous class members,

who were still waiting for their compensation seven years after the appeal had been filed. Reaching a revised settlement, so that the promised relief could finally be delivered to claimants, understandably took priority over reopening the claim period for other class members who had failed to file a claim for whatever reason in 2005.

This outcome is fair for the class as a whole, even if it may not be ideal for the five complainants (which is an extraordinarily low number relative to the size of the class).  *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2d Cir. 1974) ("The evaluation of a proposed settlement requires an amalgam of delicate balancing, gross approximations and rough justice."). The class was adequately notified regarding the necessity of filing a claim, and the procedure and deadline for doing so, through the extensive notice campaign for the original settlement. Considerable amounts of effort and money went into developing and implementing the program, which comprised publication of notice in 80 U.S. newspapers and magazines, 21 Canadian newspapers and magazines, and five other international publications; mailing of notice to over 40,000 potential class members; and outreach by the three authors' rights groups serving as plaintiffs (the Authors Guild, National Writers Union, and American Society of Journalists and Authors).  Notice by publication was envisioned as the primary method, with mailed notice as a supplement, given that the universe of potential class members far exceeded the approximately 40,000 people for whom names and addresses were available.  Even the former objectors' attorney (now serving as Category C Counsel) found no fault with the scope and reach of the notice campaign, although he vociferously contested other aspects of the settlement.

Due process requires "notice ***reasonably calculated, under all the circumstances,*** to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Central Hanover Bank Trust Co.*, 339 U.S. 306, 314 (1950)

(emphasis added); *see also Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988) ("The proper inquiry is whether the state acted reasonably in selecting means likely to inform persons affected, not whether each property owner actually received notice.").  "It is widely recognized that for the due process standard to be met *it is not necessary that every class member receive actual notice*, so long as class counsel acted reasonably in selecting means likely to inform persons affected."  *In re Independent Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 186 (S.D.N.Y. 2003) (emphasis added); *accord Shapiro*, 2014 WL 1224666, at *17 ("Neither Rule 23 nor due process requires actual notice to each possible class member . . . .").

Thus, the original notice campaign complied with the mandates of due process, and bound the current objectors to the 2005 claim deadline even if they did not receive actual notice.

### 2. Other Issues Raised By Thornton, Horschak, And Fox
### Incorrect addresses (Thornton and Horschak).

Robert Thornton and Andrew Horschak asserted that a notice concerning the revised settlement was mailed to them at an old or incorrect address, and Thornton also received notices addressed to six other people at his correct address.  These matters are irrelevant to whether they are bound by the 2005 claim deadline.  As discussed above, they are bound because of the adequacy of the 2005 notice campaign.  As for the revised-settlement notice program, while mailed notice was sent where feasible, the primary method of notice remained publication, given that the number of potential class members still far exceeded those for whom names and addresses could be obtained through reasonable effort.  In mailing notice to Thornton and Horschak, the claims administrator used addresses supplied by the publisher Cox Enterprises in 2004 or 2005.  It appears that Cox's records contained errors.  (In addition to having the wrong address for Thornton, Cox listed Thornton's correct address as the address of six other people— all named "Robert," like Thornton himself.)  Regardless of the inaccuracies, however, these were

the only addresses for Thornton and Horschak reasonably accessible to the claims administrator. Moreover, even if Thornton and Horschak never received individual notice, they would be no different from the many thousands of class members for whom no addresses were available and who will nevertheless be bound by settlement approval, as the notice program was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane*, 339 U.S. at 314.

**Scope of release.** James Fox also asserted that without an opportunity to file a claim now, "my works (weekly columns and features over the past 20 years and that continue) will not be recognized. The works continue to be available electronically, with no resolution or approval for their use that was the hallmark of this action."

First, paragraph 1(v) of the Revised Settlement Agreement says that no claims will be released with respect to works that have not, on or before May 31, 2005, been reproduced, adapted, licensed, sold, distributed, and/or displayed in electronic or digital format by any Defense Group member. Thus, Fox remains free to pursue claims against Defense Group members concerning works of his that they have initially reproduced, licensed, or displayed after May 31, 2005. Second, as for those works that are included, and as to which future-use claims are released, the Second Circuit already upheld this aspect of the settlement in its August 2011 decision. *See Literary Works*, 654 F.3d at 249 ("We therefore conclude that the Settlement's release pertaining to future uses by publishers and their sublicensees was permissible.").

**B.   The Comments Of Class Members Janice DeKnock And Barbara Kevles Are Either Mistaken Or Meritless.**

Two other class members raised different concerns about the settlement:   Janice DeKnock and Barbara Kevles.   DeKnock submitted a comment online expressing concern, based on a court filing by Category C Counsel, that he would be challenging the validity of

Category A/B claims.  Category C Counsel sent her an email assuring her she had misread the papers, he has no role in challenging A/B claims, and has no intention of doing so.  (Chalmers Decl ¶ 8.)  On April 30, 2014, Kevles faxed the Court a published op-ed of hers in which she complained that "writers whose works remain in the electronic databases will never receive royalties from rights of future use."  As discussed above, however, the Second Circuit rejected that argument in its August 2011 decision.  *See Literary Works*, 654 F.3d at 248-49.

## VII.  CERTIFICATION OF THE CLASS AND SUBCLASSES SHOULD BE MADE FINAL FOR SETTLEMENT PURPOSES.

The Court conditionally certified the proposed class and subclasses under Rule 23(b)(3) in granting preliminary settlement approval.  The Court should now make that certification final.

The case meets the numerosity requirement of Rule 23(a)(1).  The proposed class and subclasses number in the tens of thousands.

The commonality requirement of Rule 23(a)(2) is also satisfied.  As freelance authors, the class members all share the same interest in resolving such common questions as who owns the electronic rights to freelance works sold to print publications, whether defendants' common course of conduct infringed the copyrights of class members, whether such infringement was willful, and the appropriate measure of damages under the Copyright Act.  The A/B Subclass members share the same interest in resolving such questions as they pertain to holders of registered works, and the C Subclass members share the same interest in resolving such questions as they pertain to holders of unregistered works.  These and related issues predominate over any individual issues, thereby satisfying the predominance requirement of Rule 23(b)(3).

The typicality and adequacy requirements of Rule 23(a)(3) and (4) are met here as well.  The claims of the representative plaintiffs are typical of those of the rest of the class, and the representative plaintiffs have no interests antagonistic to those of the rest of the class.  The

claims of the A/B Plaintiffs are typical of those of the A/B Subclass, and the claims of the C Plaintiffs are typical of those of C Subclass.  Furthermore, the representative plaintiffs have retained counsel who are highly experienced in class action and other complex litigation.

A class action is a superior means of fairly and efficiently resolving this dispute.  There is little interest among class members in individually controlling the prosecution of separate actions, as per-author damages are generally too low to justify the cost of such litigation. Furthermore, it is appropriate to concentrate litigation of the claims in this forum, as many of the Defense Group members are headquartered in this District.  *See* Fed. R. Civ. P. 23(b)(3)(A)-(C).[8]

Thus, certification of the class and subclasses under Rule 23(b)(3) should be made final.

## VIII.  <u>CONCLUSION</u>

For the foregoing reasons, plaintiffs respectfully request that the Court grant final approval of the revised settlement.

Dated:  June 3, 2014                            Respectfully submitted,

*/s/ A. J. De Bartolomeo*

Michael J. Boni
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004

A. J. De Bartolomeo
Girard Gibbs LLP
601 California St., 14th Floor
San Francisco, CA 94108

---

[8] For settlement, manageability under Rule 23(b)(3)(D) need not be addressed.  *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.").

Diane S. Rice
Hosie Rice LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111

Gary Fergus
Fergus, A Law Office
595 Market Street, Suite 2430
San Francisco, CA 94105

Category A/B Counsel

Charles Chalmers
Allegiance Litigation
769 Center Boulevard, Suite 134
Fairfax, CA 94930

Category C Counsel