UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x

                     :   MDL No. 1379 (GBD)

IN RE LITERARY WORKS IN ELECTRONIC
DATABASES COPYRIGHT LITIGATION     :

                      AFFIDAVIT IN SUPPORT
                 :   OF BASS MOTION

- - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK   )
                ) ss.:
COUNTY OF NEW YORK  )

     EMILY M. BASS, being duly sworn, states:

     1.  I am a member of plaintiffs' executive committee in the above-captioned action (the "MDL") and was counsel, with Girard Gibbs DeBartolomeo (then Girard & Green), for plaintiffs in the Laney class action that was one of the class actions consolidated in the MDL.

     2.  As further detailed below, I also initiated and litigated the test case upon which the MDL was predicated, Tasini v. The New York Times Co., 93 Civ. 8678.

     3.  I submit this affidavit in support of my motion for an award of attorney's fees from the common fund for work I and my colleagues performed in the Tasini case that conferred a direct material benefit on the class.

     4.  My claim (including a recalculation of my fee for my MDL hours) totals $1,671,097.36, and is broken out in detail at the end of this affidavit, starting at paragraph 87.

## The History of the Litigation

### Initial Development of Claim

5. I was approached in early 1992 by officers of the National Writers Union ("NWU") regarding the events that ultimately gave rise to the Tasini case. The NWU is a trade union whose members include journalists and freelance writers. Several NWU freelance members had discovered that articles they had written for print publications had appeared in one or another electronic database. The NWU sought my advice on whether this was legal and, if it was not, what, if anything, they could do about it.

6. Based on my initial research, it seemed that the answer was far from simple. It depended, I concluded, on a confluence of two things: (1) what the arrangement was between the freelancer and the print publisher and (2) the nature of the electronic use that was made of the article.

7. The NWU was not sure what "the norm" then was of arrangements between freelancers and publishers, or what the spectrum of such arrangements might be. They thought that threshold question might be answered, however, by a general survey they had just conducted among their membership. They offered to give me access to the survey responses to see whether I could discern a pattern or paradigm.

8. Under my supervision, an NWU staffer spent several weeks analyzing the survey results and a seemingly endless array of

contracts, ultimately distilling the arrangements between print publishers and freelancers into five categories.

9. I concluded that in all but one of the categories, the freelancers had not parted with their copyrights in the electronic versions of their articles. As to those categories of works, the question then became whether, in creating their databases, electronic publishers were exercising rights the freelancers held in their contributions or that the print publishers held in their collective works. If the former, the databases infringed the freelancers' copyrights.[*]

10. I believed that the only non-infringing use was when the publisher created an intact copy of the entire collective work that had appeared in print, such as microfilm.

11. It followed that the answer to the question of whether print and electronic publishers violated freelancers' rights was a nuanced one that depended upon a variety of factors: (a) the status of the author of a contribution to a collective work (an employee or a freelancer); (b) the agreement or lack of agreement

---

[*] "Contribution" and "collective work" are statutory terms of art. A "collective work" is "a work, such as a periodical issue, anthology or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101. The producer of the collective work owns the copyright in the collective work, but only occasionally the copyright in the underlying contributions. The contribution's author owns the copyright in it unless he or she (a) is an employee of the producer of the collective work, (b) has agreed in writing that the contribution was created as a "work-for-hire," or (c) has expressly transferred his or her rights in the contribution to the collective work producer. Where none of these conditions is met, the rights of the Collective Work producer -- here, the print publisher -- attach only to the material it has contributed to the collective work, "as distinguished from the preexisting material employed in the work." 17 U.S.C. § 103(b). The publisher's copyright in the collective work "does not imply any exclusive right in the preexisting material." Id.

- 3 -

regarding rights between the author and the print publisher; and (c) the features, characteristics and functionality of the database in which contributions were re-used.

12. I found a continuum among the databases I studied, ranging from microfilm at one end of the spectrum to fully articulated databases at the other end of the spectrum. A fully articulated database is a database, like Nexis, that contains separate items -- i.e., individual articles, stories, news items -- each of which is capable of being accessed either as a stand-alone unit or in combination with any number of other items contained in the database.

13. In between these two extremes, there were hybrid databases that could be manipulated in two ways. The end-user could either reassemble an image of an entire issue or publication or call up page-views, corresponding with individual articles, from different issues of a single publication -- or from a multitude of sources rather than a single publisher.

Shaping the Test Case

14. Based upon my belief that there was a legitimate claim for copyright infringement, the NWU indicated that it was interested in bringing a test case. A long-time colleague of mine, Linda A. Backiel, agreed to assist me on the case.

15. I thought that the best means of proceeding was to bring a class action, drawing representative plaintiffs from the members of all major writers' organizations. Since the NWU did not have the resources to financially underwrite such a litigation, we

prepared a detailed proposal to present to the NWU's parent union, the United Auto Workers ("UAW"), in the hope of interesting its General Counsel, Jordan Rossen, in the project.

16. Based on Mr. Rossen's practical objections to the class-action strategy (described in his accompanying affidavit), we set out to win a case that would establish that a variety of electronic databases infringed freelancers' copyrights. That would then be the basis for a class action, through which we would obtain compensation for the writers.

17. In the Summer of 1993, the NWU began referring members to me who expressed interest in participating in a test case. To guard against the likelihood of attrition in the group of plaintiffs, I wanted some redundancy in the claims we interposed for them. I met separately with close to 20 individuals, many for a couple of hours, and had further contact with them during a follow-up period that the NWU arranged so the interviewees could ask me further questions and make a decision on whether to join the case.

18. At the end of this period, we had 10 people who represented a broad base across all of the categories I identified as necessary for a future class action.[*]

19. My identification of defendants was similarly with a view toward the class action. I wanted to be able to test the

---

[*] Between the filing of the original complaint and an amended complaint, an additional writer was joined. Over the course of the litigation, that additional writer entered into a settlement with his publisher, and four other writers dropped out of the case for personal reasons. Thereafter, at the appeal stage, we had six of the 11, but still spanning all categories.

legality of both fully articulated and hybrid databases, as well as single-source and multiple-source databases. Also, since on-line databases and CD-ROMs presented different legal issues, at least insofar as display rights were concerned, I needed examples of each.

20. I ended up focusing on two database defendants which, between them, produced three databases I thought we should challenge. The two companies were Mead Data Central (now Reed Elsevier) and University Microfilms (which became the UMI Company and I believe was then taken over by Bell & Howell). The three databases were Lexis-Nexis, the New York Times on Disc ("NYTOD") and General Periodicals on Disc ("GPOD").

21. Lexis-Nexis was a fully articulated multi-source database; NYTOD was fully articulated and single-source; GPOD was a hybrid database. In addition, Lexis-Nexis represented a database that was accessible on-line, whereas both GPOD and NYTOD were embodied in CD-ROMs.

22. Having established who our parties were, we had extensive internal debate on the substantive issue of what constituted the acts of infringement.

23. It was suggested that we could arrange for someone to download and print out the plaintiffs' articles from electronic databases and make those downloads the basis for the charge of infringement and the claim for damages.

24. I perceived several problems with this strategy. Among them, I did not think that targeting the distribution to the end-user struck at the heart of the infringements committed by

- 6 -

database producers or would provide a basis for awarding meaningful relief to a broad spectrum of authors. I also reasoned that likely only a very small fraction of the freelance articles that had been incorporated into these databases had ever been downloaded by end-users.

25. In my view, the more appropriate act of infringement to pursue was the incorporation of articles into an electronic database in the first place. My analysis concluded that the rights of every freelancer whose articles were carried in one of our targeted databases were infringed, regardless of whether those articles had ever been accessed, downloaded or printed out by an end-user.

26. Therefore, I argued that the primary infringement we had to challenge was the act of initial incorporation. Second, we had to challenge the database producers' offering of the articles as individually retrievable units -- either by themselves or in combination with other material that had not been part of the original collective work. If we prevailed in the view that either of these acts constituted infringement, then all freelancers whose works were in these databases would benefit, regardless of whether they had ever been accessed.[*]

---

[*] As we subsequently learned during discovery, none of the databases on which we initially sued tracked or recorded such information. It would therefore have been impossible to tell with respect to them whose articles had or had not been distributed to or downloaded by an end-user. Therefore, this tactical decision turned out to be a critical one for the eventual MDL.

We did cause plaintiffs' articles to be downloaded, not in order to claim the retrievals as primary infringements or even infringements for which the publishers were contributorily liable, but simply in order to verify that plaintiffs' articles were still available on the databases.

27. It turned out that these threshold issues continued to be the source of recurring divisions on plaintiffs' side at critical junctures over the next nine years. There were in fact two major matters on which there was stark disagreement:

(a) the nature of the infringements defendants had committed; and

(b) whether it was an actionable infringement for print and/or electronic publishers to create a microfilm or other intact copy of the entire collective work.

28. Those freelancers who viewed the database producers' distributions to end-users as the only acts violative of the Copyright Act felt that I had defined the defendants' infringements overbroadly. A different segment of the freelancer community challenged me from the opposite perspective. In their view, even microfilm violated their rights. To the extent that I had suggested that it might not be infringing, they felt I was ceding on a key infringement.

29. These very early discussions over microfilm were valuable in my development of my theory of the case, which guided my way through discovery in the District Court and underlay my arguments at both stages of appeal.

30. Section 201(c) of the Copyright Act permitted defendants to reproduce and distribute individual contributions in a collective work only "as part of that particular collective work, any revision of that collective work, and any later collective work in the same series." I concluded that, to prevail, we needed to show that the defendants engaged in an elaborate technological

process to make <u>individual</u> <u>articles</u> retrievable, as opposed to intact copies of collective works. To convey this theory in the most understandable fashion, I crafted what I came to call my "spare parts" analogy.

31. As explained below, the "spare parts" metaphor served as my road map for discovery in <u>Tasini</u>. It also opened both my summary judgment motion to the District Court and my brief to the United States Supreme Court:

> This is a case about spare parts and the used vehicles they come from -- vehicles that bear a striking resemblance to used cars.
>
> In the life of an automobile, there comes a time when that vehicle is worth more disassembled than left put together.
>
> Then, the car is taken apart, and its parts are sold off -- the engine, the muffler, the bumpers, fenders, doors, the front and back windshields, and even the hubcaps may be sold separately by . . . used-parts suppliers.
>
> The same fate now awaits today's newspaper or magazine and tomorrow's literary or social science journal. Such publications have a short shelf life: They quickly become "yesterday's papers."
>
> But after the publications no longer have any value at the newsstand, they still have plenty of value when they're disassembled and the "parts" -- i.e., articles, reviews, op-ed pieces, etc. -- are put up for sale.
>
> As a consequence, even before the presses cool, the publications are dismantled and their parts are sent off to Lexis/Nexis and/or . . . UMI, where the parts experience a second life.
>
> This is the story of twenty-one (21) such parts or articles and the journey that they and other

articles like them have taken through the new technologies. It is also the story of the extent to which the authors' rights in those articles have been infringed along the way.

32. The "spare parts" metaphor not only distinguished infringing databases from those that were not; it also defined the divide between plaintiffs' and defendants' factual claim: that is, whether the defendants had placed intact copies of collective works into electronic databases or only their component parts. If the latter, did they make the parts retrievable only together with the entire collective work? Or did they configure and electronically tag component parts so that they could be retrieved as stand-alone units?

33. In my view, while distributions to the end-users were not the primary infringements upon which we should be focusing, they were additional infringements for which the publishers were liable.

34. On December 16, 1993, I filed the complaint in the Southern District of New York, where it was assigned to then-District Judge Sotomayor.

35. Discovery, which proceeded on these issues over the ensuing four-year period, required extensive preparation against worthy adversaries who spared no resources. From plaintiffs' side, it was aimed primarily at ascertaining how defendants' databases were assembled and their characteristics and functionality. I set out to make a factual record that defendants very carefully placed individual articles into separate electronic files and then "keyworded" or encoded them so they would be

accessible and retrievable apart from other works with which they had originally appeared -- rather than "as part of" the original collective works.

36. In addition, our discovery focused on establishing the steps the print publishers took to assist the electronic publishers in readying articles for incorporation into the databases.

37. We also had a lot of discovery to answer. Defendants were particularly attempting to ascertain whether the freelance community generally and the NWU in particular were aware of certain publisher and database practices and could be said either to have consented to them over the years or to have waived their right to object to them.

38. In response to my initial document requests, I was presented with some 15,000 "confidential" documents and, I believe, another 10,000 non-confidential documents. I brought on an additional full-time associate to help me review and distill down these materials.

39. At the same time, my staff had to wade through nearly an equal amount of material provided to us by plaintiffs in order to extract the documents that had to be produced to the other side, as well as material that might help us prepare plaintiffs for their own depositions.

40. During 1995 and early 1996, my office took seven depositions and defended eleven. Of those, I personally took five depositions and defended eight.

41. In addition, the parties exchanged interrogatories and requests for admission, both of which were extensive. Our first discovery demands were served before depositions. However, when key questions remained unanswered by the depositions -- in particular, regarding the procedures the defendant print publishers followed in readying articles for transmission to the electronic publishers, as well as those the electronic publishers followed in generating and re-generating their databases -- we served further, special sets of interrogatories on the defendants.

42. Since the confidentiality order required that information each defendant produced was to be kept confidential from each other defendant, we had to draft and serve at least three separate sets of each form of discovery.

43. In preparation for the parties' cross-motions for summary judgment, we also promulgated three sets of requests to admit, containing in total more than one thousand requests for admission with respect to matters that were contained in the documentary material.

44. I distilled this enormous record, with substantial assistance from Linda Backiel, for the summary judgment motions. We drafted plaintiffs' and opposed defendants' lengthy Rule 3(g) statements, and prepared moving, opposing and reply briefs. Plaintiffs' 3(g) statement with respect to the New York Times alone ran to 307 paragraphs. There were similarly detailed 3(g) statements for the other defendants.

45. Along with affidavits from four expert witnesses and others, our summary judgment motion included an affidavit by me

that lays out the fruits of our effort to establish that the electronic use of plaintiffs' works constituted infringements of the Copyright Act. It is submitted herewith as Exhibit A.

46. Reflecting the industry-wide recognition that the Tasini case threatened enormous changes to existing practices, amicus briefs (which were limited to issues not covered in the parties' briefs) were submitted on both sides of the issues. Amici included all of the organizations and many of the print and electronic publishers that have participated in the MDL.

47. On October 17, 1996, the District Court heard oral argument in the case. At the Court's request, the parties returned to present a demonstration of the relevant technology on December 10, 1996. At that time, plaintiffs demonstrated how the technology substantiated our legal theories.

48. On August 13, 1997, the District Court issued a lengthy decision granting defendants' and denying plaintiffs' motions. (The opinion is reported at 972 F. Supp. 804.) Although Judge Sotomayor agreed with plaintiffs on the facts and on three out of four discrete legal issues posed in the cross-motions, at the time that was small consolation. The court ruled against us on the issue that had captured the most attention: whether section 201(c) of the Copyright Act gave defendants the privilege to put freelancers' literary works into databases without their permission.

49. The other three rulings -- that were nonetheless of tremendous practical importance to freelancers -- may be summarized as follows:

(a) that a grant of "first" publication rights did not include database rights;

(b) that the databases in question were not archives and therefore not encompassed within a grant of authority to place articles into an archive; and

(c) that publishers could not acquire rights after publication, as they had purported to do here, simply by placing a legend on the back of a check that the author then cashed.

50. Because they had no cachet, these issues got no attention. What also initially passed almost entirely without notice was that the District Court had agreed with plaintiffs on the facts, ruling against them as a matter of law. The Court found that print publishers delivered individual articles to the databases (rather than collective works) and that the database producers incorporated individual articles (rather than intact collective works) into their databases.

51. The District Court nonetheless held on two grounds that, as a matter of law, the articles they incorporated were still "part of" the original collective works in which they had appeared. It reasoned: (a) that articles that had once appeared together in a print edition of a newspaper or magazine were all still present somewhere in the database; and (b) that each article that was retrieved was accompanied by a legend identifying the original print publication.

52. I concluded that the underpinnings of the decision were correct, only the conclusion was wrong, and that we therefore had a strong basis for a successful appeal. Shortly after the ruling,

on the invitation of the New York State Bar Association, I wrote an article entitled "Micro-Film and Macro-Questions" for the Association's Fall 1998 newsletter explaining the respects in which I believed the decision erred (submitted herewith in Exhibit B).

53. Without calling them such, the article explained both of the theories I had pressed in the District Court (the one exemplified by the spare-parts metaphor, and a second one tied to the graphics in the article), and spelled out the grounds on which I expected an appellate court to rule that the databases at issue, unlike microfilm, infringed freelancers' rights. As it turned out, I was proved right.

### The Second Circuit

54. Although the UAW said my work was excellent and that I should handle the briefing on appeal, it took the position that we should bring in a "name" lawyer to handle the appellate argument -- someone the Circuit judges would recognize, and who would know the Circuit judges.

55. Over the ensuing months, it evolved that Patricia Felch, Esq., represented four plaintiffs on the appeal. Two of the plaintiffs, Barbara Garson and Sonia Jaffe Robbins, continued to be represented by my office.

56. Mr. Rossen asked my office to prepare the record on appeal, and we agreed to do so, even though, with the advent of new counsel, we were no longer guaranteed any payment from the UAW or NWU.

57. While I was also asked to draft a joint brief on behalf of all six plaintiffs, in the final analysis it was decided that separate briefs would be submitted for the two groups of plaintiffs. I then finalized the draft brief I had prepared, and submitted it on behalf of my clients, Garson and Robbins. I also prepared for and participated in oral argument.

58. On September 24, 1999, the Second Circuit Court of Appeals affirmed those aspects of the District Court's decision that plaintiffs had won below, and reversed on the interpretation of section 201(c). The decision was amended on February 25, 2000, and is reported at 206 F.3d 161.

59. The Court adopted the grounds I had argued, holding that by making individual articles retrievable either as stand-alone works or in conjunction with new material, the print and electronic publishers had infringed the freelance authors' copyrights and not acted within the section 201(c) privilege.

60. Three class actions were filed on the heels of the Second Circuit decision: Laney, Authors' Guild and Posner. The settlement of these consolidated actions (together with a fourth, coordinated action) is now before this Court for final approval.

Certiorari and the Appeal
to the Supreme Court

61. In addition to spawning three class actions, the Second Circuit decision, not surprisingly, triggered a petition for certiorari by defendants.

62. On behalf of Garson and Robbins, I submitted an opposition to defendants' certiorari petition.  My opposition differed from the opposition filed by the UAW in that I emphasized my spare-parts theory of the case.  I did so because I was convinced that certiorari was going to be granted, and wanted the opportunity to set out the merits clearly and simply.

63. The Supreme Court granted certiorari on November 6, 2000.  Once again there was a debate about having a recognized "name" attorney to conduct oral argument.  Because I had conceived of the theories and labored on the case for nine years, I felt I was the best-equipped lawyer to orally argue plaintiffs' position before the Supreme Court.  Indeed, I had just recently been honored by the National Law Journal as one of ten "stand-out attorneys" in the Second Circuit for the year 2000, based on my argument in Tasini.  (See Exhibit C.)  Nevertheless, I lost a coin toss to the UAW's new counsel for the Supreme Court phase, Laurence Gold of Bredhoff & Kaiser.

64. My office did the spadework of preparing the plaintiffs' joint appendix (over 750 pages).  In addition, both Mr. Gold and I filed briefs for plaintiffs to the Supreme Court.  Although I thought in most respects our briefs dovetailed nicely and that Mr. Gold's brief provided a very clear explication of my theories, there was a significant issue on which the briefs diverged, in a replay of differences that hailed from the first days of the litigation.

65. The Gold brief suggested that there was evidence in the record of third-party downloads -- when the only evidence was of

the downloads we had arranged to verify the continued carrying of the articles. More important, it identified the databases' distributions to End-users and the public as the infringements upon which we were suing.

66. My brief continued to identify the initial incorporation of the articles into the databases and re-publication of the databases as the primary infringements. I argued that actions by print publishers to help prepare material for incorporation represented contributory conduct.

67. After our briefs were filed, Mr. Gold and I met for approximately four and a half hours as part of his preparation for oral argument. At the end of the meeting, he told me that it had been the greatest help anyone had given him in preparing for the argument. There were about eight days to go before oral argument, during which he called me a number of times, and a few of the conversations were extended ones. (I did not make time-sheet entries for these. Attorney's fees were the furthest thing from my mind; I was just thinking about our side winning the argument.)

68. A few days before the argument, Mr. Gold focused on the competing theories of infringement. He said that it was the view of some members of his team that infringement only occurred when the database actually distributed electronic text to an end-user. He asked me whether there was any evidence in the record of such distributions.

69. I explained that the only retrievals we were aware of were those we had arranged for, and we only arranged for them to verify that the subject articles were still available. Evidence

was simply not available of any other downloads, because the databases in question claimed not to have the ability to track them and had not captured or recorded information on which articles were retrieved.

70. I also explained my view that, while a database's distributions to an end-user qualified as infringements, they were not the primary ones. I explained that I litigated the case on a different theory. What I had set out to prove, and thought I _had_ proved, was that freelance authors' rights were infringed in the first instance when their articles were incorporated into databases, regardless of whether those articles were ever individually accessed, let alone downloaded or printed out.

71. By the same token, I thought I had proved that print publishers committed contributory infringement when they provided article-files to the databases and helped ready those files to be retrieved on an article-by-article basis.

72. However, at his request, I spent at least 20 hours poring over documents and rereading depositions and responses to requests to admit to see if I could come up with anything useful. I provided to Mr. Gold photocopies of the few pages I found here and there referring to databases not involved in our case, but there was nothing of real use in connection with the databases at issue.

73. Again at Mr. Gold's request, I met with him in Washington the day before the argument, for between two and three hours at his office, to prepare further.

74. At the Court the following morning, Mr. Gold asked me to sit next to him during the argument. When we went into the courtroom, however, Ms. Felch indicated that she felt that was her place, and I deferred.

75. I believe it would have been of great assistance to Mr. Gold if I had been able to second-seat him. As the New York Law Journal reported the next day, "[t]he hour-long argument was dominated by questions on such technical issues as how articles are transmitted to Lexis/Nexis and other databases, and when, precisely, the alleged copyright infringement occurs. . . . [W]as it when the newspaper transmits the articles, when the database prepares and offers them for sale or use, or when a reader buys them?" (See Exhibit D.)

76. These were the questions that I had been preparing to meet for years; they were also the questions that had long divided people associated with the case -- and on which I differed with the plaintiffs who had retained Mr. Gold for this stage of the case, since they wanted to premise infringement on distribution to the end-user, rather than incorporation into the electronic database. I felt that Mr. Gold wisely avoided giving too narrow an answer to the justice's question of when the infringement first occurred.

77. Fortunately, in the end, the Court adopted the theory articulated in the briefs but not at oral argument: that the database producers infringed the freelancers' copyrights by incorporating freelance articles into their databases, and that the print publishers committed contributory infringement by

providing the articles to the databases and helping prepare the articles for incorporation. The Court also clearly stated that microfilm or its equivalent was not an infringement.

78. On June 25, 2001, the Supreme Court affirmed the decision of the Second Circuit by a 7-to-2 vote. The decision, which is published at 533 U.S. 483, vindicated my legal theory in every respect.

Related Activity in Class Action

79. After the Second Circuit decision, the three class actions were filed. A number of statements by the various parties confirming the importance of the Tasini case to those actions are discussed in my memorandum of law.

80. Many of the statements were in formal court filings, with copies of which I have not burdened these papers. Exhibit E contains excerpts from a letter addressed to this Court by Messrs. Boni, Fergus and Hosie and Ms. Hoguet, dated January 24, 2001, responding to the Court's query whether the class actions should be stayed pending the Supreme Court's ruling in Tasini.

81. When the Supreme Court affirmed our win in the Second Circuit, the Tasini case was remanded to the District Court and was initially assigned to Judge Richard Casey. The parties proceeded to discuss scheduling the remaining issues in the litigation: damages, injunctive relief and attorneys' fees.

82. However, before anything further took place in Tasini, this Court ordered the MDL parties to seek a settlement through mediation, which commenced in January 2002, with Kenneth Feinberg

and Peter Woodin of the Feinberg Group. Since I was one of class counsel, and Jonathan Tasini was President of the NWU, we both participated in early MDL mediation sessions.

83. On September 30, 2002, as best I recall the date, at one of the mediation sessions, the mediators asked Mr. Tasini and me to meet with them separately in our <u>independent</u> <u>capacity</u> as counsel and lead plaintiff in <u>Tasini</u>. In a separate conference room, Mr. Feinberg urged us to have <u>Tasini</u> transferred to Judge Daniels and referred to mediation with his firm. He said that, unless the <u>Tasini</u> defendants (who, of course, were also defendants in the MDL) could obtain "complete peace" -- that is, settlement in full of both the MDL and <u>Tasini</u> -- there was no hope of settling the MDL. It was clear from other things that the resolution of the <u>Tasini</u> fee was an issue that was part of the "complete peace."

84. Mr. Feinberg also said (and I am quite sure I am accurately repeating his words), "Emily, don't worry about your fees. All of the defendants [in the MDL] agree that you deserve the lion's share of attorney's fees, not these Johnny-come-latelys," and he indicated with his hand the other room where the other class counsel were gathered.

85. After conferring with my clients, the UAW, Jordan Rossen and Patricia Felch, all six plaintiffs agreed to the transfer of the case. Judge Casey's order, issued on November 15, 2002, specifically referred to "pre-trial coordination" with the MDL.

86. The <u>Tasini</u> mediation was put on hold while the MDL mediation proceeded. Then the position was conveyed to me that

the MDL settlement would only be finalized if I agreed to settle _Tasini_ separately, _in advance_ of the MDL settlement. To ensure a settlement of the MDL, I did so, despite its leaving me vulnerable by essentially limiting my chance of finally getting paid for my years of work to this application.

## The Specifics of My Claim

87. I am submitting herewith, in Exhibit F, summaries, based on contemporaneous records except as noted further below, of the time and disbursements that are the basis of my _Tasini_-related request. They span the District Court proceedings through the United States Supreme Court appeal. The underlying detail is being submitted herewith in a separate volume ("Time Records"), in which the time for which I seek compensation is highlighted in yellow.

88. I am not seeking compensation out of the common fund for work that I performed prior to January, 1993, although it was substantive and extensive, since I do not have the time records from that period. There is substantial work I did regarding the make-up of the class (which spanned the District Court and Second Circuit phases of the case) that I explain below under a separate heading that also is not included in my fee calculation.

89. I am not asking to be compensated for my work on the remand in _Tasini_, because that work benefitted the individual _Tasini_ plaintiffs rather than the class. I have omitted certain of my services in the other phases of the case falling within two categories: first, services, like those on the remand, that

clearly conferred a benefit on individuals (as opposed to the class generally), such as the settlement I negotiated for a plaintiff who settled; and second, services that only arguably benefitted the class, such as my defense of the <u>Tasini</u> plaintiffs' depositions.

90. In my Time Records, I have included my contemporaneous time records for my work in the MDL that is summarized in my separate affidavit submitted as part of Lead Counsel's fee application.  I do so because I believe that the class is entitled under amended Federal Rule 23 to have access to the records underlying a fee application.

## The District Court

91. My office billed for 3,672.46 hours in the District Court phase.  Of that total, I believe that 2,689.97 hours conferred a benefit on the class, which I refer to below as the "Class Component" of my District Court hours.  I am seeking to be compensated for those hours out of the common fund to the extent that I have not already been compensated (as detailed below).

92. That Class Component total breaks down into three subcomponents: (a) the hours worked by partners in my firm and my co-counsel, Linda Backiel (1,777.31 hours); (b) the hours worked by associate-level attorneys (543.32 hours), and (c) the hours worked by a person knowledgeable about freelance practices who served as my paralegal (369.34 hours).

93. During the District Court proceedings, I was paid for my team's work at subsistence levels by the NWU and the UAW.  The two

unions together advanced funds to me at the rates of $135.00 per hour for partner-level work, $85.00 per hour for associate-level work, and $25.00 per hour for our paralegal.[*]

94. I am seeking in this motion to be paid for all Class Component time, including in the District Court, at rates that are at least closer -- although not equaling -- market rates for that work: $450.00 an hour for partner-level work, $250.00 an hour for associate-level work and $75.00 an hour for paralegal work. The lodestar at those rates for 2,689.97 hours of work amounts to $963,320.00.

95. As shown in Exhibit F, although I have already been paid $239,936.85 for that work, I am obligated to reimburse half that amount, or $119,968.42, to the UAW. I am accordingly making application for $815,643.73 out of the common fund, which is the difference between $963,320.00 and the amount I am not required to reimburse.

96. I incurred expenses of $74,919.16 in the District Court, all of which were advanced by the UAW. However, since only 73.25% of my hours in the District Court were Class Component hours (2689.97/3672.46), I have assume for purposes of this application that I am only entitled to recoup 73.25% of my District Court expenses. That amounts to $54,878.28.

---

[*] The Court asked me to advise it of my total hours, my total lodestar, my total expenses, and the total amount I have been paid during the past 12 years for my work in <u>Tasini</u>. That information is set forth in the third of the three charts in Exhibit F.

## The Second Circuit

97. Of the 559.55 hours of work my office performed in connection with the Second Circuit appeal, 528.07 represent services that conferred a benefit on the class. All of the work was performed by partner-level attorneys and 331.22 of those hours are supported by contemporaneous time records.

98. There are two instances where time was not contemporaneously recorded in electronic time slips but can be conservatively stated. The first concerns the time Gaynor & Bass spent preparing the Second Circuit record on appeal, which was at least 80 partner hours. (See Mr. Gaynor's accompanying affidavit at ¶¶ 4, 5.) The second is the time I spent finalizing the main brief on appeal and preparing the reply brief. I spent at least 160 hours on these tasks. I submitted an affidavit swearing to the reply brief hours shortly after its decision issued, in a fee request to the Second Circuit. (The Circuit remanded the fees issue to the District Court.) I am asking to be compensated for 116 of those hours.

99. Since I was not paid any compensation by anyone for the work that was performed on appeal, I am seeking $266,445.00 for my office's work in the Second Circuit.

100. My office incurred $2,946.59 in expenses in the Second Circuit, all of which were advanced by the UAW. I am seeking to recoup 94.37% of that amount, or $2,780.69.

The Supreme Court

101. Of the 566.27 hours of work that my office performed
in connection with the proceedings before the Supreme Court,
534.63 conferred a benefit on the class. All of the work was
performed by partner-level attorneys, and all but 30 hours are
supported by contemporaneous time records. The 30 additional
hours was the time that I spent during the final seven to ten days
preceding the Supreme Court argument assisting Mr. Gold.

102. Since I was not paid anything by anyone for any of the
work that was performed in connection with the Supreme Court
proceedings, I am making application for my office's complete
lodestar. That amounts to $240,583.50.

103. In addition, my office incurred expenses of $10,074.36
in the Supreme Court, none of which were covered by the UAW or any
other source. I am seeking to recoup 94.41% of that amount, or
$9,511.20.

104. To sum up, my office is seeking the following for the
Class Component hours in Tasini:

| Phase | Fee | Expenses |
|-------|-----|----------|
| District Court | $815,643.72 | $54,878.28 |
| Second Circuit | 218,437.50 | 2,780.69 |
| Supreme Court | 240,583.50 | 9,511.20 |
| Remand | 0.00 | 0.00 |
| Totals | $1,274,664.72 | $67,170.17 |

105. In addition, I am seeking $315,603.00 for my services
in the MDL, by multiplying the hours I reported in my affidavit

The Supreme Court

101. Of the 566.27 hours of work that my office performed
in connection with the proceedings before the Supreme Court,
534.63 conferred a benefit on the class.  All of the work was
performed by partner-level attorneys, and all but 30 hours are
supported by contemporaneous time records.  The 30 additional
hours was the time that I spent during the final seven to ten days
preceding the Supreme Court argument assisting Mr. Gold.

102. Since I was not paid anything by anyone for any of the
work that was performed in connection with the Supreme Court
proceedings, I am making application for my office's complete
lodestar.  That amounts to $240,583.50.

103. In addition, my office incurred expenses of $10,074.36
in the Supreme Court, none of which were covered by the UAW or any
other source.  I am seeking to recoup 94.41% of that amount, or
$9,511.20.

104. To sum up, my office is seeking the following for the
Class Component hours in Tasini:

| Phase | Fee | Expenses |
|-------|-----|----------|
| District Court | $815,643.72 | $54,878.28 |
| Second Circuit | 218,437.50 | 2,780.69 |
| Supreme Court | 240,538.50 | 9,511.20 |
| Remand | 0.00 | 0.00 |
| Totals | $1,274,664.72 | $67,170.17 |

105. In addition, I am seeking $315,603.00 for my services
in the MDL, by multiplying the hours I reported in my affidavit

made part of Lead Counsel's application by the hourly rate I am using for my _Tasini_ work (rather than the hourly rate used in that application), and my expenses reported in that application, totaling $13,659.47.

## My Work Regarding the
## Make-up of the Class

106. After Judge Sotomayor's ruling was issued, commencing in the Spring of 1999, I undertook what I saw as the next step in _Tasini_: I began considering how we could enable the writing community generally to benefit if we prevailed on appeal. In my judgment, of the issues that would be involved in the class phase, the only major issue left, which was a difficult one, was whether a class could include claimants whose works had never been separately registered with the U.S. Copyright Office. As a general rule, no action for infringement of a work can be instituted until the work has been registered.

107. This was at the point where the unions ceased advancing me payment of fees, and yet again being more result-oriented than fee-conscious, I did not keep contemporaneous time records for much of the work. Nor did I have occasion (as with my Second Circuit fee application) to make a contemporaneous estimate. For that reason, since I have sought to be conservative in every aspect of my application, I am not including these hours in my request.

108. However, understanding the equitable nature of the Court's fee determination, I believe that my work on this issue,

which conferred a major benefit on the class, is a factor that the Court may consider relevant in its allocation of fees.

109. My work on this important issue continued in the MDL. I estimate that I spent 300 to 400 hours on this issue prior to the filing of the Laney complaint. Since Lead Counsel instructed me that no time that predated the filing could be included in my MDL hours, I will not be compensated under their proposed formula for this time.

110. After considerable research into the Copyright Act, I concluded that, as long as the individuals who "instituted the action" had registered their works, which we had done, others whose works were unregistered should be able to piggyback on the representative plaintiffs' claims. I shared my conclusions with Mr. Girard of Girard & Green when we began discussing collaboration on the case that became Laney, including in a memo, dated November 10, 1999.

111. When Girard & Green did the first draft of the Laney complaint, they limited the class to authors of registered works. I was able, on the basis of my research, to convince them to change the pleading. Therefore, the Laney complaint, filed in late August 2000, stated infringement claims on behalf of all freelancers whose works were carried on any of defendants' non-microfilm databases, whether or not they had been registered.

112. The Posner and Authors Guild complaints (original and amended) shared the same infirmity as Girard & Green's first draft. Posner limited its class to writers who owned a registered copyright or had filed to register for copyright in their works

that met the infringement criteria.  Authors Guild added to their class foreign authors who under the Berne Convention were not required to register in order to bring an action under the Copyright Act.

113. In the meantime, I had developed two further legal theories, not based solely on the Copyright Act, in support of an expanded class.  First, the situation we faced was not unlike that in Title VII actions, where individuals who have not filed claims with the EEOC are routinely permitted to piggyback on the claims of representative plaintiffs who have exhausted their administrative remedies.  By virtue of this "single filing rule," individuals who have never filed are nonetheless recognized as valid class members.  I considered that the principle could equally apply here and, indeed, for a number of reasons, was even more defensible from a legal perspective.

114. The other argument, which I considered the strongest, was premised on the fact that the copyright statute and its legislative history recognized that even an author of an unregistered work had a valid claim for infringement when his or her copyright was violated.  That is, the author had a cause of action, even if the court did not have jurisdiction over it.  I therefore reasoned that, under the supplemental jurisdiction statute, 28 U.S.C. § 1367, so long as there existed one claim over which the Court has original jurisdiction, it could assume supplemental jurisdiction over all other claims, even if they were jurisdictionally defective, within the constitutional limits of a "case or controversy."

115. After the Supreme Court win in _Tasini_ and the consolidation of the three class actions, plaintiffs' counsel turned to preparing the first consolidated amended class action complaint.

116. While all counsel with the exception of the Laney group had previously been opposed to defining the class so as to include all non-registered claimants, they now adopted the Laney group's position. That was the position I had formulated.

117. I was also able to convince other counsel to insert a reference to the supplemental jurisdiction statute, 28 U.S.C. § 1367, in the jurisdiction allegations in the consolidated class action complaint. My legal analysis was just vindicated in the Supreme Court's ruling in _Exxon Mobil Corp._ v. _Allapattah Services, Inc._, 2005 U.S.Lexis 5015 (June 23, 2005). The Court there held that the statute supplies jurisdiction over claims that are otherwise jurisdictionally defective, as long as there is one claim over which the trial court has original jurisdiction.

118. Class counsel also ultimately adopted the three-tiered structure I had proposed in my August 2000 memo for structuring any settlement. There I described three sub-classes of writers: class members who have registered their works, entitling them to statutory damages; class members with registered works, but not entitled to statutory damages; and class members with unregistered works. As the Court will recognize, these three sub-classes were the genesis of categories A, B and C in the settlement.

119. I respectfully submit that the impact of taking these positions was of enormous benefit to the class. As mediator

Kenneth Feinberg stated in his declaration dated May 18, 2005, submitted by Lead Counsel in opposition to a motion made to vacate preliminary approval, "[O]ne of the few points on which the parties readily agreed during the mediation was that an extremely low percentage of freelance authors ever registered their freelance works."  But for my legal research and insistence on including unregistered works, I think it is fair to say that the class would likely have numbered merely in the few hundreds.

### The Tasini Settlement

120. The Tasini settlement included payment by the three publisher-defendants in that case of an attorneys' fee of $300,000.00, one-third of which was paid to the UAW, which had incurred legal fees for the Meyer Suozzi firm on the remand and had assumed other costs during the litigation.

121. The $200,000.00 that I received in the Tasini settlement was not for services or hours that are the basis of this motion.  Rather, the Tasini defendants only agreed to make payment toward services I rendered that benefitted the individual plaintiffs, as opposed to the class generally.

122. The payment made to me in Tasini was far from full compensation for my non-class-related hours.  Those hours are reflected in Exhibit F under the heading "Individual Component" and would result in a fee award (at the rates employed in my motion) of over $375,000.00.

123. The Tasini settlement also reflected the parties' mutual understanding that the work my office performed that

benefitted the class would be compensated out of the MDL common fund. (See Exhibit G herewith, ¶ 7.)

My Background and
Current Market Rate

124. As instructed by Lead Counsel, I annexed a résumé as an exhibit to my affidavit in Lead Counsel's fee application. Since it did not include a history of my professional affiliations, I am submitting herewith an expanded version. (Exhibit H.)

125. Lead Counsel required that the hourly rate I stated in their fee application for purposes of the MDL lodestar be the rate I personally bill for non-contingency matters. Although I have billed at $425.00, I bill individuals at $400.00 and therefore used that rate in the interest of full disclosure.

126. Since it is my understanding that the law calls for use of an applicable market rate for an attorney's services, as opposed to his or her actual billing rate, I have calculated this request for fees (including re-calculating for my MDL submission) at the hourly rate of $450.00 per hour.

127. In this regard, the Court will find that other class counsel at partner level have all billed higher than $450.00 and, but for one (at $475.00), significantly higher.

128. I have equally used market rates for associate level and paralegal-level work that are considerably lower than those sought by other class counsel. For associates, I am seeking $250.00 per hour, and for paralegals, $75.00 per hour. A brief

statement of the backgrounds of the attorneys who worked with me on the Tasini case is attached as Exhibit I.

## Conclusion

129. I respectfully ask this Court to exercise its equitable discretion and award me fees from the class fund in recognition of the benefits I have conferred on the thousands of writers who will receive payments in the settlement that the Court is, I hope, about to approve.

*Emily M Bass*

Emily M. Bass

Sworn to before me this
30th day of June, 2005.

*Karen Shatzkin*

KAREN SHATZKIN
NOTARY PUBLIC, State of New York
No. 02SH4699901
Qualified in New York County
Commission Expires Sept. 30, 20 05