# CHARLES D. CHALMERS
ATTORNEY
P.O. Box 159
San Geronimo, CA 94963
Tel 415 860-8134
Fax 801 382-2469

Charles D. Chalmers
chalmerscd@gmail.com

March 24, 2015

Hon. George B. Daniels
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York City, New York 10007

Re:   *In re: Literary Works in Electronic Databases Copyright Litigation*  MDL 1379
      Response to 2-24-15 letter of A/B counsel Diane Rice

Dear Judge Daniels:

Ms. Rice misstates the reason I refused the instructions; I address that below. For the last 10 years, before you and before the Second Circuit, the A/B and defense counsel have accused me of bad intentions. As class counsel for the C Category claims I represent the vast majority of claims and the vast majority of claimants. There are 306,000 C claims and about 8,000 A/B claims. There are approximately 3000 claimants with C claims and about 300 claimants with A or B claims. I seek only to do my fiduciary duty.

This issue involves thousands of claims and the vast majority are C claims. How many claims and claimants are involved I have been unable to learn. The core of this issue is whether the affected claims get the compensation they are entitled to under the settlement.

**Referral to Magistrate**

The requested referral would not be legally proper or efficient for the issue.

1. There is provision in the Revised Settlement Agreement contemplating referral of "claim disputes" to a magistrate, or to binding arbitration. But this issue isn't a "claim dispute." The pertinent excerpt is attached – it applies to disputes about individual claims that are "disputed" by a publisher or database. This issue is about how to process a group of claims where the proper information is not available. This is a situation involving implementation of the Revised Settlement Agreement and such issues are reserved to the

Court under the order approving the settlement. Order Granting Final Approval etc., Docket 52, paragraph 10.

> [T]he Court hereby reserves jurisdiction over the subject matter and to each party of the Agreement with respect to the interpretation, effectuation, and implementation of the Agreement for all purposes, including enforcement of any of the terms hereof at the instance of any party and resolution of any disputes that may arise relating in any way to, or arising from, the implementation of the Agreement or the implementation of this Order.

2. The only issue on which I now seek the Court's assistance is how to get the claims processing moving. However, other issues arising from the improper 2005 advice may come before the Court after that first problem is resolved. The settlement database does not contain the proper information for the processing of thousands of claims because the A/B counsel admittedly placed improper advice to the class on the settlement website in 2005. They put it there to avoid syndicated writers making an objection to the fairness of the settlement. I came into contact with such a class member, David Butler, for the first time in January of this year, and learned this history from his copies of communications in 2005 with the A/B counsel (then class counsel). Attached is a copy of an email he provided me showing the concern he expressed in 2005 to Diane Rice that the settlement was "wholly unfair" to syndicated writers. By the website advice, which A/B have acknowledged was not proper, they avoided objections that the court might well have upheld. If those issues do come before the Court at a later time, it would be inefficient for the Court to learn, or relearn, this history at that time.

## The Present Issue

The issue is not whether the claims involved are valid. After extensive review they are considered valid. The issue is that the proper information to establish the compensation is not available. For C and B claims the amount of compensation is a function of the amount paid by a publisher. But these syndicated writer were told to only provide the total paid by all the publishers in a syndication. Compensation based on that amount would not be proper.

The specific reason I refused the instructions of 3-19-15 is this part:

> If a claimant contended that his article was published by 20 publishers and lodged an aggregated payment number totaling up 20 payments, we've said we didn't object to GCG's **pricing the claim on the basis of $1/20^{th}$ of the claimed aggregate payment**, so as to reasonably attempt to reconstruct the prior compensation received for a single use. (Emphasis added)

This proposal is unacceptable because it is measurably less favorable than a compromise worked out for other claims which present a similar problem. In that compromise, the claimant gets paid the highest amount paid by a single publisher when multiple publishers published the same work. In that situation we have the amounts paid by the different publishers. For the syndication claims we don't have it because class counsel told them it did

not have to be submitted. I know from talking to two such claimants that some of their syndicating publishers paid more than others. So they should be entitled to compensation paid on that highest payment, but we don't have the information.

I don't have the answer. It may be necessary to contact those who filed syndication claims and ask for the necessary information. The defense counsel proposed that as a solution. They would be asked for information that is 10 to 30 years old. I don't know how many such claimants there are. I've asked the Claims Administrator but received no response. Maybe another formulaic approach, more fair than the "1/20" idea, can be developed. If after due consideration this Court ordered the "1/20th" rule, I would abide by it to allow claims processing to advance. I would then address the prejudice suffered by these claimants in a different proceeding.

**Conclusion**

Most important is that something is done to allow claim processing to proceed, and that the choice of that something is approved by the Court. Maybe it is necessary to carve these syndication claims out from the rest and proceed with claim processing that way. The "we deal with problems as the come up" approach does not work for this issue. The problem is up now and involves insuring fair compensation to people who were put in this position by no fault of their own.

This presentation is abbreviated to respond promptly to Ms. Rice's letter, because it is not complete or accurate. I continue to propose presentation and then rebuttals on a shorten schedule to be sure that the Court has the whole picture. I urge the Court to view the presentation of A/B and defense counsel with skepticism. In 2005 I argued that the "C Reduction" was an unfair settlement provision. A/B and defense counsel argued strenuously that the information they developed over five years of litigation, as well as interim claims data, permitted them represent that the $11.8 million trigger of the Reduction of C compensation would never be reached – not even approached. They predicted a maximum total of $3.5 million for A, B and C claims. A year later they told the Second Circuit the claims were $10.8 million. Several years later, after this case took its detour to the Supreme Court, they told the Second Circuit the claims were now $11.5 million.

*S/*
Charles D. Chalmers

cc: all counsel by email

should be supported by demonstrative evidence to the extent reasonably available, or, if not, certifications, establishing that such articles were not distributed, displayed, or transmitted by such database, or that the work is otherwise ineligible.

    i.    Claims that appear to have been misaddressed or misdirected (*e.g.*, to the wrong publication, the wrong publisher, an inaccurate email and/or physical address, or an incorrect contact person) will be re-submitted to the correct publication and/or publisher with proper address, and the deadlines will run from actual receipt

    ii.    Claims not objected to in a timely manner, or not found invalid on their face by the Claims Administrator, will be paid pursuant to section 7 below.

    iii.    Contested claims will be put aside for resolution (*see* section 5 below).

5.    <u>Dispute Resolution</u>

a.    Claimants submitting a disallowed claim will receive (if they have not already received) a notice identifying the reason(s) for the disallowance, and will be afforded an opportunity to cure any deficiencies so as to render the claim valid unless they were afforded such an opportunity in 2005-2006.

b.    The parties will attempt informally, on a rolling basis, to resolve all disputed claims.

c.    If the parties are unable to resolve all disputed claims, the remaining disputed claims will be resolved by summary binding arbitration before a United States Magistrate Judge from the Southern District of New York assigned by the Court who agrees to do so, or, a magistrate is not available, to an arbitrator the parties jointly agree to use. The arbitrations will be set at the earliest possible date after the end of the claims period, and shall be conducted sequentially on one day (or consecutive days) in New York City. The Claimant and parties may participate by telephone.

6.    <u>Final Report</u>

The Claims Administrator will prepare a Final Report for distribution pursuant to paragraph 2.c. of the Revised Settlement Agreement. The Final Report will list, for each Claimant whose claim has been allowed in full or part, the Subject Works on which the person's claim is based that have been deemed valid and the works deemed invalid (if any), the original publication of each work, the amount per Subject Work under the Plan of Allocation, and the total Settlement Payment. The Final Report will also list the Claimant whose claims have been disallowed in full.

7.    <u>Payment of Claims</u>

a.    Upon receipt of all outstanding amounts due pursuant to the terms of the Revised Settlement Agreement according to the procedures set forth in paragraph 2.c of that agreement, the Claims Administrator shall prepare a single check for each claimant for

6

31416225v15

**Subject:** Re: procedural question regarding copyright class action
**From:** "David Butler" <davidbutler52@aol.com>
**Date:** 6/6/2005 6:26 PM
**To:** "Diane Rice" <drice@hosielaw.com>

Hi Diane,
Thank you for your prompt attention to my inquiry. Your response to #3 raises another important question (see below):

On Monday, June 06, 2005 7:59 PM, Diane Rice wrote:
> David-
> 1. No
> 2. Yes
> 3. I have raised your question (an excellent one) with the claims
> administrator and await his/her reply.
> You will be paid for one claim per story.
> Thank you. Diane Rice

If I'm only eligible to submit one claim per story, then I need to clarify what that means to me in terms how to fill out question 4 on the claim worksheet (e.g., amount paid by the"original" publisher). Since all of my papers were billed at the same time for a given article, the concept of an "original" publisher is meaningless here.

Your response suggests I must choose one newspaper as the basis for my claim. Considering the genesis and nature of the class action as outlined in the litigation package, this seems wholly unfair as it would grossly underweight my participation in the class action.

The nature of syndication is that each publisher pays a far lower price per article than would otherwise be required, considering the time and effort involved to produce the material (research, writing, editing, administrative, etc.). Some of my smaller newspapers paid me as little as $6 per article. Even the largest papers (e.g., Atlanta Journal-Constitution, San Jose Mercury News, etc.) paid less than $50 per article, still far less than any writer would accept for an article. You see my point?

Note: The majority of free lance newspaper columnists (at least those whose articles appear in more than one newspaper) work through syndicates. In this case, the syndicate itself could be considered the original publisher. This means the author would be able to claim the full amount of his/her compensation for each article.

In my case, I was "self-syndicated". As I understand it, there were only a handful of others who were self-syndicated on a national basis.

In my mind, there is only one way for me to answer question 4: that is, to submit the total amounts paid by all newspapers for each story.

This is, of course, a separate question from the submission format issue, and should be resolved before attempting to work out a spreadsheet or other alternate format.

Please advise...

Best Regards,
David Butler
704-588-2453